IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2024

**IN RE COLTEN B.**

**Appeal from the Juvenile Court for Cocke County**
No. TPR-06760      Mark Blaine Strange, Judge

_____

**No. E2024-00653-COA-R3-PT**

_____

This appeal involves a petition to terminate parental rights of a mother and father to their young son. The trial court found by clear and convincing evidence that a ground for termination existed due to a prior finding of severe child abuse and that termination of parental rights was in the best interest of the child. The parents appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Tammy Nicole Barry, Newport, Tennessee, for the appellant, April T.

Lyndon Keith King, Jr., Kodak, Tennessee, for the appellant, Christopher B.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

The child at issue in this proceeding, Colten B., was born in August 2022.[1] Colten's parents, April ("Mother") and Christopher ("Father"), were not married, but they executed a voluntary acknowledgment of paternity. They were living with Mother's grandmother

---

[1] This Court has a policy of protecting the identity of children in termination of parental rights cases by using initials.

at the time of Colten's birth.[2]  On September 6, 2022, when Colten was two weeks old, the Tennessee Department of Children's Services filed a petition to adjudicate him dependent and neglected and the victim of severe abuse.  According to the petition, the family came to the attention of DCS due to allegations of drug exposure, and hospital personnel informed a DCS investigator that Colten's "cord stat" was positive for methamphetamine and amphetamine.  According to the petition, the DCS investigator was unable to drug screen either parent or view the child at their initial meeting because Father demanded that the investigator leave the property.  At their second meeting, Mother agreed to a drug screen but then was unable to produce a urine sample.  The petition stated that Mother eventually admitted to methamphetamine use early in the pregnancy and also admitted to marijuana use, and Father admitted to using Suboxone without a prescription and also marijuana.  Based on these facts, DCS asked the court to enter an immediate protective custody order placing the child in the temporary custody of DCS and to allow Mother and Father only supervised visitation.  DCS also alleged that Colten was dependent and neglected and the victim of severe abuse pursuant to Tennessee Code Annotated section 37-1-102(b)(27).  The juvenile court entered a protective custody order that same day, placing the child in the temporary legal custody of DCS and limiting Mother and Father to only supervised visitation.  Colten was placed with a foster parent when he was about sixteen days old.

The juvenile court entered an order on October 20, 2022, after an adjudicatory and dispositional hearing and severe abuse hearing.  The order states that Mother and Father both failed to appear for the hearing but were represented by counsel.  The court continued the matter only as to Father.  The court found by clear and convincing evidence that Colten was dependent and neglected within the meaning of the law and that it was contrary to his welfare to remain in Mother's care.  The order further found that Mother committed severe abuse against Colten pursuant to Tennessee Code Annotated section 37-1-102(b)(27)(A)(i) due to the use of methamphetamine during pregnancy.  The court found that Colten's cord stat was positive for methamphetamine and amphetamine, the case manager was refused access to the home and Colten in the absence of a court order, and Mother eventually admitted to using methamphetamine and marijuana during her pregnancy.  The order provided that DCS would retain custody of the child and that the parents would have no contact with him pending further hearings.

A second order was entered on November 3, 2022.  It states that an additional hearing was held on November 3 and that Mother and Father again failed to appear.  The court found severe abuse, as defined by Tennessee Code Annotated section 37-1-102(b)(27), was committed by Father for the reasons set forth in the petition.  Like the previous order, the order stated that Colten's cord stat was positive for methamphetamine and amphetamine, the investigator was refused access to the home, and Mother later admitted to using methamphetamine and marijuana during the pregnancy.  The order

---

[2] Father has another child, who lives in Indiana with that child's mother.

contained the same provisions regarding temporary custody remaining with DCS and prohibiting contact between the parents and child pending further orders. It also provided that DCS was relieved of making reasonable efforts.

On February 9, 2023, DCS filed a petition to terminate the parental rights of Mother and Father. By that time, Colten was almost six months old. The petition alleged that one ground for termination existed due to Colten being adjudicated severely abused by the October and November orders.[3] It further alleged that termination of parental rights was in the best interest of Colten because he tested positive for methamphetamine at birth, he had remained in a foster home for the majority of his life and knew no other home, the parents had continued to use illegal drugs, and they were not compliant with DCS.

Both parents were appointed counsel. In April 2023, an order of continuance was entered in connection with a scheduling conference, stating that both parents had indicated "they would be leaving the state to attend a rehabilitative treatment facility in California the following week." The termination trial was set for October 2023, but it was apparently reset for February 2024 by agreement. Prior to trial, in November 2023, Mother and Father filed a joint motion for supervised visitation with Colten, who was one year old by that time. The motion stated that both parents were admitted to a partial hospitalization program in California in May 2023, which they eventually completed, followed by a 55-day intensive outpatient treatment program completed in August 2023. The parents alleged that they had been clean since entering these programs and had provided documentation to DCS, but the orders regarding visitation had never been amended. As such, they asserted that it was in the best interest of Colten to allow supervised visits via telephone or video conference, and face-to-face visits when appropriate. The motion for visitation was heard on January 4, 2024, and it was denied by order entered January 23. At the outset, the order noted that trial on the petition for termination of parental rights was set for February 1. The order stated that both parents were still residing in California and attended the hearing via video conference. According to the order, the trial judge was unable to see the parents on the video due to poor lighting in the room, and when the trial judge continued the matter until after lunch due to the court's schedule, Father responded by using inappropriate language. Thus, the order states that it was in the best interest of the child to deny the motion for supervised visitation based on the trial judge's inability to see the parents on the video conference and Father's behavior toward the court.

On January 30, Father filed a motion for continuance of the February 1 trial date, stating that he and Mother had originally planned to move back to Tennessee by the time of trial, but they had been unable to relocate in that timeframe. They asked the court to continue the trial in order to permit them to be present and testify in person, or alternatively, to conduct the trial via video conference. On February 1, the trial court entered an order

---

[3] Other grounds were also pled, but the final order in this case states that DCS voluntarily nonsuited those grounds prior to trial.

continuing the matter until March 2024, noting that both parents remained in California and were unable to appear. The court declined to conduct a hearing by video conference because the parents had tried to participate in hearings by Zoom previously and "there were several issues." The court admonished the parents that they would need to be at the upcoming trial date in person in order to participate.

The case was finally tried on March 12, 2024. By that time, the termination case had been pending for over a year, and Colten was 18 months old. He had resided in the same foster home since he was removed from Mother and Father at two weeks old. The trial court heard testimony from Mother, Father, two of Colten's case managers from DCS, and Colten's foster mother. DCS also introduced into evidence the relevant documents from the prior proceeding in which Colten was adjudicated dependent and neglected and severely abused by both parents. Those orders had relieved DCS of reasonable efforts and imposed the no contact order, which remained in effect at the time of trial. Before entry of the no contact order, Mother and Father had two supervised visits with Colten soon after his removal. However, according to the case manager at the time, they "appeared to be under the influence" and were unable to keep their eyes open and their heads up. They were unable to hold the child correctly or his bottle when feeding him. The case manager drug screened Mother, and she tested positive "for multiple things" including methamphetamine. Father was not tested due to some issue involving abnormal pH levels. At the time of the termination trial, those two visits were the last occasions when Mother and Father had any contact with Colten. Colten had been diagnosed with neonatal abstinence syndrome. He was "delayed a little bit" and needed "extra learning help," but he was receiving feeding therapy and speech therapy. Colten was improving and was "starting to talk a little bit." His foster mother desired to adopt Colten if he was available for adoption.

Mother testified that she began a rehab program in April 2023, which was after the petition to terminate parental rights was filed in February 2023. She testified that the reason she left Tennessee for California was because she was unable to find a rehab facility in Tennessee, as the facilities she called were either full, unaffordable, or did not accept her TennCare coverage. By the time of trial, she had completed a 30-day detox program, a 45-day partial hospitalization program, and a mental health intensive outpatient program that lasted around six weeks. She was currently prescribed Subutex, and she and Father were living at a sober living facility with six recovering addicts. Her testimony regarding drug testing was a bit unclear. She initially appeared to state that she never failed a drug test while in California. However, later she was asked "when is the last time you took a drug screen that you failed for that wasn't prescribed medication or anything that's a legal substance?" She responded, "Almost a month ago." When Mother was asked if she did everything in her power to try and reach out to her case managers, she candidly admitted, "At first, no." Mother conceded that she had not seen Colten since around the time of his removal, but she believed that "it wouldn't take him long" to develop a bond with her because of his young age. Mother believed that she could care for Colten appropriately.

- 4 -

Mother mentioned the possibility of remaining in California and trying to "have our case transferred." When asked if she planned to return to Tennessee if she was given the chance to regain custody of Colten, Mother stated, "(Witness paused) Uh...(witness paused)... if it's in his best interest, yes. But we would rather just, you know...(witness paused)...whatever it takes, you know. I would rather come back here and get everything situated but we want to go to where he can be with his sister."

Father's testimony was similarly unclear as to their future plans. He testified that if he had to move back to Tennessee immediately, he could live at his parents' house, although he had "really planned on getting my own place and not having to go back with my family at first." He testified that he had not returned from California because he was still working on his sobriety and saving money. However, he testified that his substance abuse issues had been remedied, and he felt comfortable moving back to Tennessee if it meant he would have a chance to regain custody.

At the conclusion of the trial, the trial judge announced his oral ruling that he found clear and convincing evidence of grounds for termination based on the previous finding of severe abuse, and the trial judge addressed each of the statutory best interest factors and determined that termination of parental rights was in the best interest of Colten. A written order to that effect was entered on April 4, 2024, terminating the parental rights of both parents. Both parents appealed to this Court.

## II. ISSUES PRESENTED

Although Mother and Father filed separate briefs on appeal, they both present a single issue for review – whether the trial court erred in finding clear and convincing evidence that termination of parental rights was in the best interest of Colten. Regardless of whether the parties have raised the issue, however, we must also review the trial court's decision as to the sole ground for termination. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023) (citing *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015)). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing

conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

When the petition to terminate parental rights was filed, Tennessee Code Annotated section 36-1-113(g)(4) provided that one ground for termination of parental rights existed if:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court *or* is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

(emphasis added).[4] Notably, this ground for termination provides two different "avenues

---

[4] The language in subsection (g)(4) has since been amended. *See* 2024 Pub. Acts, c. 613, § 9, eff. July 1, 2024. We apply the version of the statute in effect when the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

- 6 -

for a finding of severe child abuse." *In re Anna B.*, No. M2016-00694-COA-R3-PT, 2017 WL 436510, at *4 (Tenn. Ct. App. Feb. 1, 2017). The finding may have already been made in a "prior order of a court," *or*, in the alternative, the finding may be made "by the court hearing the petition to terminate parental rights or the petition for adoption." *See* Tenn. Code Ann. § 36-1-113(g)(4); *In re Anna B.*, 2017 WL 436510, at *4. Thus, "'[a]s the statute makes clear, the finding of severe abuse can be based on a prior court order or on evidence of 'severe child abuse' submitted to the court hearing the termination case.'" *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *4 (Tenn. Ct. App. Dec. 22, 2017).

"A finding of severe abuse in dependency and neglect proceedings has serious ramifications . . . since a finding of severe abuse can serve as a ground for termination of parental rights." *In re Kaliyah S.*, 455 S.W.3d at 537 n.5 (citing *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011)). In a subsequent termination of parental rights proceeding, the doctrine of res judicata prevents a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action. *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012)). "The doctrine of res judicata is 'based on the public policy favoring finality in litigation and does not depend upon correctness or fairness, as long as the underlying judgment is valid.'" *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *7 (Tenn. Ct. App. Nov. 16, 2015) (quoting *Lee v. Hall*, 790 S.W.2d 293, 294 (Tenn. Ct. App. 1990)). As such,

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. . . . The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*In re Samaria S.*, 347 S.W.3d at 201 (quoting *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)). Upon a finding of severe abuse, "one ground for termination of the parent's parental rights is effectively established." *Id.*

When proceeding under the "prior order" avenue of ground (g)(4), "the ground is proven by the prior order finding severe child abuse." *In re B.R.W.*, No. M2008-00468-COA-R3-PT, 2008 WL 2811301, at *2 (Tenn. Ct. App. July 21, 2008); *see, e.g.*, *In re Madylynn C.*, No. M2021-00184-COA-R3-PT, 2021 WL 4476810, at *10 (Tenn. Ct. App. Sept. 30, 2021) *perm. app. denied* (Tenn. Dec. 28, 2021) ("Because neither Appellant challenged the finality or the validity of the adjudicatory dependency and neglect order, the issue of severe child abuse is res judicata."); *In re S.M.C.*, No. 01A01-9807-JV-00358, 1999 WL 378742, at *2-3 (Tenn. Ct. App. June 11, 1999) ("The existence of the prior court order finding the [parents] committed severe child abuse suffices to establish grounds for

termination of parental rights under Tenn. Code Ann. § 36-1-113(g)(4).").

Here, the trial court accepted the previous adjudication of severe abuse as res judicata and found that the requirements of Tennessee Code Annotated section 36-1-113(g)(4) and section 37-1-102(b)(27) had been met. Both parents' attorneys conceded during closing arguments that the previous finding of severe abuse was res judicata and that they were not disputing the previous order, and neither raises any issue on appeal regarding this ground for termination. Because the final orders of the juvenile court found that both parents committed severe child abuse under Tennessee Code Annotated section 37-1-102(b)(27), this ground for termination of their parental rights "is effectively established." *In re Samaria S.*, 347 S.W.3d at 201.

## B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee Code Annotated section 36-1-113(i) provides, in pertinent part:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

- 8 -

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

According to the Tennessee Supreme Court:

When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 681-82.

In this case, the trial judge went through the entire list of best interest factors during his oral ruling and again in his written order. In fact, he stated during his oral ruling, "When determining and looking at the best interest factors what I like to do is I just like to go down the list one-by-one and explain my reasoning and whether or not I find it in the best interest of the child that the rights be terminated or in the alternative I find it in the best interest of the child for the rights not to be terminated. So I'm going to go down through them one-by-one." The trial court ultimately found that thirteen of the twenty factors weighed in

- 10 -

favor of termination, and the remaining seven did not apply either because of the child's young age or the lack of proof at trial.

Despite the trial court's explicit discussion of the factors individually, Mother argues that the trial court's findings are insufficient to enable appellate review, and a remand is necessary for the trial court to "further review" the remaining factors. At the same time, however, in her list of the remaining factors in her brief, she "concedes" that there was no discussion of four of those factors at trial, so Mother does not analyze those factors either. Father's brief admits that "all twenty factors were enumerated" in the trial court's order, but he claims that "there were not enough applicable facts stated in the order to support the findings." With regard to the factors the trial court deemed inapplicable, Father states that he "does not contest the neutrality" of two of those factors, and his brief simply states that three other factors were deemed inapplicable with no further analysis.

"All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3). However, "'a trial court is not required to restate the relevant factual findings within the discussion of each and every ground and best interest factor to comply with section 113(k) so long as the order contains sufficient findings to explain and support the trial court's conclusions, allowing for meaningful review of the trial court's decision.'" *In re Elizabeth Y.*, No. E2023-01448-COA-R3-PT, 2024 WL 3738701, at *14 (Tenn. Ct. App. Aug. 9, 2024) (quoting *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *8 (Tenn. Ct. App. Dec. 4, 2023)). Having carefully reviewed the trial court's order, we deem its findings sufficient to enable appellate review. Although the trial court discussed each factor individually, we will combine our discussion of various factors. Appellate courts often "group our discussion of the best interest factors 'based on the overarching themes within the list of twenty factors' . . . because many of these factors touch on similar factual predicates and involve similar issues." *In re Kurt R.*, No. E2023-01108-COA-R3-PT, 2024 WL 4040828, at *13 (Tenn. Ct. App. Sept. 4, 2024) *perm. app. denied* (Tenn. Nov. 27, 2024) (quoting *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023)); *see also In re Tad F.*, No. E2023-01626-COA-R3-PT, 2024 WL 3507716, at *8 (Tenn. Ct. App. July 23, 2024); *In re Silvia F.*, No. E2023-00704-COA-R3-PT, 2024 WL 3496302, at *16 (Tenn. Ct. App. July 22, 2024); *In re Ezra C.*, No. M2023-00927-COA-R3-PT, 2024 WL 3385712, at *8 (Tenn. Ct. App. July 12, 2024); *In re Quentin G.*, No. E2023-01632-COA-R3-PT, 2024 WL 3324105, at *6 (Tenn. Ct. App. July 8, 2024).

We first consider the factors regarding the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect well-being), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the child is fearful of living in the parent's home), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). With respect to these

- 11 -

factors, the trial court found that Colten was placed in DCS custody in September 2022 and had been in foster care continuously since his removal. The court found that Colten "needs stability and has it in his current pre-adoptive placement and that stability will continue if adopted." The court found that "there is an obvious bond with the foster parent and family," so that the factor regarding attachment "weighs heavily" in favor of termination. The court found that the testimony of the foster mother "speaks volumes in that the child does not know any other family other than his foster family," and the child, though just beginning to talk, already used a certain name to refer to the foster mother as "a term of endearment." It also found that Colten had "formed significant attachments with his foster siblings, the family dog, and other members of his foster family." The trial court found that if Colten was removed from his foster family at this point, "it would be extremely detrimental to him both emotionally and psychologically as he has formed significant familial attachments and bonds to his foster family." It further found that "Mother and Father have no attachment to this child because they have never been able to visit the child throughout the pendency of this case and there is no reasonable expectation that it would be remedied."[5] During his oral ruling, the trial judge elaborated further on this factor, noting that the last in-person visit between the parents and the child was in September 2022, when Colten was about a month old, and Mother had failed a drug test for methamphetamine. The trial court deemed factor (T) inapplicable, regarding mental or emotional fitness of the parents, due to the lack of testimony on that issue. It also deemed factor (F), regarding whether the child would be fearful of living in the parents' home, to be inapplicable due to Colten's young age and the fact that he "can't say whether he would be fearful or not."

On appeal, Mother concedes that Colten "was removed shortly after birth and has not had contact with Mother since that time," and she acknowledges the trial testimony that "the child would not know either parent if he saw them." However, Mother argues that this "presumably would indicate that [Colten] was not fearful and therefore [this] should have been addressed under Factor F," as that factor concerns "[w]hether the child is fearful of living in the parent's home." Tenn. Code Ann. § 36-1-113(i)(1)(F). A mother made a similar argument in *In re Bentley R.*, No. W2023-01665-COA-R3-PT, 2024 WL 3443817, at *11 (Tenn. Ct. App. July 17, 2024), suggesting that factor (F) and another factor should have weighed in her favor in the absence of proof that the child at issue was fearful. We explained:

> Concerning factors (F) and (G), related to a child's fear of living with the parent and whether the parent or her home would exacerbate the child's trauma, the Trial Court made the following findings of fact:

---

[5] Mother and Father argue that the trial court incorrectly found that they "have never visited the minor child throughout the pendency of this case." They contend that there were two visits instead of none. However, those visits were prior to the petition to terminate parental rights, so they were not during the "pendency of this case." The trial court's finding was not incorrect.

> There is no evidence that Child is fearful of living in the home of Mother, so this statutory factor is of little to no weight in the court's analysis.
>
> There is a lack of evidence in the record that allows the Court to say that living in the home of Mother would exacerbate any trauma or post-traumatic symptoms of Child (although, as stated elsewhere, the Court finds that living with Mother carries other risks of harm), so this statutory factor is of little to no weight in the court's analysis.
>
> Mother contends that the Trial Court erred by weighing these factors neutrally instead of against termination of her parental rights. This Court has previously affirmed a trial court's decision to weigh these two factors neutrally in the absence of evidence. *See In re Evandor C.*, No. M2022-01697-COA-R3-PT, 2024 WL 678014, at *17 (Tenn. Ct. App. Feb. 20, 2024) (agreeing with the trial court that these factors weighed neutrally when it was "unknown whether he is fearful of living in the parent's home or whether he was traumatized"). We accordingly reject Mother's argument that the Trial Court incorrectly weighed these factors neutrally.

*In re Bentley R.*, 2024 WL 3443817, at *11-12. *See also In re Azelea B.*, No. M2023-00656-COA-R3-PT, 2024 WL 657652, at *23 (Tenn. Ct. App. Feb. 16, 2024) (deeming factor (F) neutral due to the children's young age at the time when they were in the parents' home and the fact that they did not know who the parents were at the time of trial); *In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *11 (Tenn. Ct. App. May 16, 2023) (agreeing with the trial court that factor (F) did not weigh in favor of or against termination where there was "no significant testimony" on that factor).[6]

In another case, we deemed factor (F) "inapplicable" where a child had never lived in the parental home. *See In re Tayla R.*, No. M2024-00248-COA-R3-PT, 2024 WL

---

[6] We recognized that factor (F) was "somewhat difficult to address" in a case involving an incarcerated father as there was "no home of Father's for the child to be fearful of or triggered by visiting," but we ultimately concluded that it did not weigh against termination. *In re Madilyn B.*, No. M2023-00035-COA-R3-PT, 2023 WL 7158074, at *7 (Tenn. Ct. App. Oct. 31, 2023). In another case, we found that factor (F) weighed heavily in favor of termination where a mother testified that a child "would be fearful in Father's home (to the extent that he could establish one) because he is nothing more than a stranger to her." *In re Keigen D.*, No. M2023-01555-COA-R3-PT, 2024 WL 4274379, at *8 (Tenn. Ct. App. Sept. 24, 2024); *but see In re Royalty Y.*, No. W2023-01333-COA-R3-PT, 2024 WL 2042496, at *16 (Tenn. Ct. App. May 8, 2024) (agreeing with the trial court that factor (F) did not weigh in favor of termination where the child "had no reason to fear Mother" as the child "was days old upon entering DCS custody and held no memory of having been in Mother's custody or home").

4950106, at \*21 (Tenn. Ct. App. Dec. 3, 2024) ("DCS concedes that factor (F), regarding a child's fear of living in the parental home, is inapplicable since the Child never lived in Mother and Legal Father's home. For their part, Foster Parents argue that factor (F) applies and weighs in favor of termination. We agree with DCS as to the inapplicability of factor (F)[.]"). We have deemed factor (F) inapplicable in many other cases as well. *See, e.g.*, *In re Lilah G.*, No. E2023-01425-COA-R3-PT, 2024 WL 3825077, at \*10 (Tenn. Ct. App. Aug. 15, 2024) (agreeing with the trial court that factor (F) did not apply because there was no proof regarding it presented at trial); *In re Elizabeth Y.*, 2024 WL 3738701, at \*15 (noting that the trial court "omitted any reference" to factor (F) presumably finding it inapplicable, and agreeing that it "would weigh neither for nor against termination" because the child never resided in the home); *In re Logan F.*, No. M2023-01280-COA-R3-PT, 2024 WL 3534932, at \*12 (Tenn. Ct. App. July 25, 2024) (finding factor (F) inapplicable where the court heard no testimony regarding whether the child would be fearful of living in the home); *In re Quentin G.*, 2024 WL 3324105, at \*7 (same); *In re Zoey O.*, No. E2022-00500-COA-R3-PT, 2023 WL 3222699, at \*14 (Tenn. Ct. App. May 3, 2023) ("The trial court also found that the factors set forth in Tennessee Code Annotated section 36-1-113(i)(1)(F) and (G) do not apply in the present case. The record supports these findings."); *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at \*23 (Tenn. Ct. App. Nov. 10, 2022) ("Like the juvenile court, we find that factors (F), (G), and (S) are inapplicable. There was only one incident at an in-person visit at Mother's home which resulted in Joseph becoming confused and upset. There was no evidence that Joseph would fear living in Mother's home[.]"); *but see In re Ethan W.*, No. E2024-00318-COA-R3-PT, 2024 WL 4600451, at \*19 (Tenn. Ct. App. Oct. 29, 2024) (concluding that factor (F) weighed against termination where there was no proof regarding that factor); *In re Freddy P.*, No. E2023-00042-COA-R3-PT, 2024 WL 660195, at \*12 (Tenn. Ct. App. Feb. 16, 2024) ("there was no proof as to whether the child was fearful of living in Mother's home, which weighs against termination"); *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at \*14 (Tenn. Ct. App. Oct. 31, 2023) ("DCS's failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable").

Father states in his brief that he "does not contest the neutrality of" factor (F). As in *In re Bentley R.*, 2024 WL 3443817, at \*11-12, we deem factor (F) neutral. But, in any event, regardless of whether we characterize factor (F) as inapplicable, neutral, or even assuming arguendo that it should weigh against termination, the labeling of this single factor would represent "harmless error because overall the best interest analysis weighs against maintaining [Mother and] Father's parental rights to the [child]." *In re Erin N.*, No. E2021-00516-COA-R3-PT, 2022 WL 444284, at \*27 (Tenn. Ct. App. Feb. 14, 2022); *see also In re C.T.*, No. E2021-01336-COA-R3-PT, 2022 WL 2236147, at \*11 n.5 (Tenn. Ct. App. June 22, 2022) ("Regardless of whether the additional factor weighed in favor of termination or was neutral, the evidence is still clear and convincing that termination was in the best interest of the child."). Within her discussion of this factor, Mother concedes that she is a total stranger to Colten and that he "would not know either parent if he saw them." Mother and Father have no relationship with Colten. Colten's foster home is the

only home he has known, and his foster family is the only family he has known. "'This court has repeatedly indicated that often, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest.'" *In re Silvia F.*, 2024 WL 3496302, at \*18 (quoting *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at \*11 (Tenn. Ct. App. Feb. 28, 2023)); *see also In re Freddy P.*, 2024 WL 660195, at \*13 (recognizing "the factor regularly considered one of the most important in our best interest analysis: the existence of a meaningful relationship between the parent and child"). Mother's argument regarding whether Colten would be "fearful" of living in the parents' home within the meaning of one factor does not alter the outcome in this case.

Recognizing the absence of an attachment, Mother argues that due to Colten's young age of eighteen months at the time of trial, he "would be able to easily adjust to living with his biological parents" and "would likely not even remember the foster mother nor the foster siblings when he is older." Thus, Mother contends that "there is no potential from harm in breaking the bond he may have with the foster parent and foster siblings." However, "this Court has acknowledged returning a child to a 'virtual stranger' after the child had developed a strong bond with a caregiver constitutes substantial harm." *In re Nicholai L.*, No. M2023-01796-COA-R3-PT, 2024 WL 4579538, at \*5 (Tenn. Ct. App. Oct. 25, 2024) (citing *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020)); *see also In re Elijah H.*, No. M2020-01548-COA-R3-PT, 2021 WL 4593844, at \*12 (Tenn. Ct. App. Oct. 6, 2021) ("removing a child who has 'bonded and thrived' with his current family and placing a child in the custody of a near-stranger would amount to substantial harm"). We considered a similar argument in *In re Braelyn S.*, 2020 WL 4200088, at \*19, where a father argued that the child's "relatively young age would allow sufficient time for the child to adapt to new circumstances and build a meaningful relationship with [him]." We explained, "the potential of any future relationship does not negate the absence of a meaningful relationship in the present." *Id.* The lack of a meaningful relationship weighed heavily in favor of termination, *id.*, just as it does in this case.

We next consider the factors regarding physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbates the child's experience of trauma), (N) (concerning abuse or neglect); (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Regarding these factors, the trial court found that Mother had never provided safe and stable care for Colten, and although Father had in the past provided safe and stable care for his other child, Father had not been able to provide safe and stable care for Colten. The court found that Mother and Father currently reside in a sober living house "with six other recovering addicts and that environment is not safe or healthy for the minor child." It found that "Mother and Father have not provided any concrete evidence that they are able to create or maintain a home that meets the child's

- 15 -

basic and specific needs and that they have only provided speculative testimony regarding potential housing." Thus, the trial court found that these factors weighed in favor of termination. However, it found that factor (G), regarding whether the home would exacerbate the experience of trauma, was inapplicable due to the lack of proof on that issue. Although the trial court inexplicably skipped over factor (N) during its oral ruling and simply stated in its written order that factor (N) was inapplicable, we conclude that it would also weigh heavily in favor of termination, as Colten was adjudicated severely abused by Mother and Father. As the trial court found, Colten was adjudicated dependent and neglected and severely abused in 2022 based on his cord stat testing positive for methamphetamine and amphetamine.

Next, we turn to the factors regarding the parents' efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (concerning efforts made by DCS); and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Here, the trial court found that "[a]lthough the Mother and Father have made great efforts in their sobriety and meeting their own needs, they have not shown that they are able to meet the child's basic material, educational, housing, and safety needs." The court recognized that Mother and Father had "worked towards adjusting their circumstances" but found that "there has not been enough progress made that it would be safe for the child to return home." The court pointed out that "Mother and Father currently live in a home with six other recovering addicts and that is not an ideal environment for the child to be raised in." Regarding the efforts made by DCS, the trial court found that DCS "did make reasonable efforts to assist the Mother and Father" up until the time when DCS was relieved of making reasonable efforts.[7] The trial court found that DCS "did what they could with the contact information they had prior to being relieved of reasonable efforts." As for the parents' sense of urgency, the court concluded that "Mother and Father made efforts to address their own circumstances, conduct, and conditions but did not progress enough for the long term benefit of the child and awarding them custody at this time would not be in the child's best interest." The trial court deemed factor (K) inapplicable.

Mother and Father argue that these factors should have weighed in their favor because of the efforts they have made to overcome their addiction issues. The trial judge specifically commended Mother and Father for their efforts and noted that they were, at the time of trial, "winning the battle to maintain their sobriety." However, he added, "It's a battle that you folks are going to face every day." He expressed hope that they would continue to fight and win the battle but noted the speculative nature of their housing plans going forward, as they intended to live and work at the sober living house with six other

---

[7] We note that DCS was relieved of making reasonable efforts to assist the parents. In *In re Kurt R.*, 2024 WL 4040828, at *14, we determined that "[m]any of these factors are inapplicable because DCS was not fully involved once they were relieved of reasonable efforts as a result of the severe abuse finding."

recovering addicts. Most importantly, the trial court emphasized that they had only demonstrated continuity and stability in meeting their *own* needs and had not reached the point where they had shown any ability to meet the basic material, educational, housing, or safety needs of Colten. The trial court found that "early on these folks didn't take advantage of the things that were offered to them." Thus, the trial court concluded that Mother and Father had "not done enough as far as long-term preparing for a return of custody." The record supports the trial court's findings as to these issues. We likewise commend Mother and Father for their progress. However, questions remain as to whether that progress will "be lasting outside of the 'controlled environment'" of inpatient treatment and the sober living house. *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *8 (Tenn. Ct. App. Aug. 15, 2023); *see also In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *13 (Tenn. Ct. App. July 6, 2021) ("While Mother's efforts to maintain her sobriety are commendable, she has not exhibited an ability to refrain from drug use for a prolonged period of time outside of a controlled environment[.]").

The remaining factors address support and knowledge of the child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs). The trial court deemed these factors inapplicable. Mother concedes that there was no discussion of these factors at trial, and Father does not analyze either factor on appeal.

Having carefully reviewed the entire record, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of Colten. *See In re Neveah M.*, 614 S.W.3d at 680. Considering the best interest of Colten, from his perspective, it is clear that termination of parental rights is in his best interest. He should be permitted to achieve permanency in the only home he has known since birth.

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is affirmed and remanded. Costs of this appeal are taxed to the appellants, April T. and Christopher B., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE